CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ELENA SADOWSKY (Bar No. 302053)
(E-Mail: Elena_Sadowsky@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
CHANTELLE LAVERGNE WOODS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>CHANTELLE LAVERGNE WOODS,<br><br>　　　　　　Defendant. | Case No. 25-256-FMO<br><br>**DEFENDANT'S POSITION REGARDING SENTENCING; LETTERS**<br><br>Sentencing Date: November 13, 2025 |

Defendant Chantelle Lavergne, through counsel of record, Deputy Federal Public Defender Elena Sadowsky, hereby submits her position regarding sentencing.

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　　　　　Federal Public Defender


DATED: November 3, 2025　　By　*/s/ Elena Sadowsky*
　　　　　　　　　　　　　　　　ELENA SADOWSKY
　　　　　　　　　　　　　　　　Deputy Federal Public Defender
　　　　　　　　　　　　　　　　Attorney for Chantelle Lavergne Woods

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................ 1

II. SENTENCING CONSIDERATIONS ....................................................................... 2

    A.    History and Characteristics of the Defendant: Ms. Lavergne's life arc shows that she is a hardworking and well-intentioned individual who is motivated to find the stability she lacked as a child, but who got temporarily lost along the way. ............................................................... 2

        1.    Ms. Lavergne's unstable childhood ..................................................... 2

        2.    Independent but not free ...................................................................... 4

        3.    The happiest time of her life ................................................................ 5

        4.    Seeking the stable family she never had ............................................. 5

        5.    Seeking stability wherever she could find it ....................................... 6

        6.    Almost losing it all .............................................................................. 7

    B.    Nature and circumstances of the offense: While running a legitimate business, Ms. Lavergne made mistakes under immense pressure at home and at work. ............................................................................................ 8

    C.    A noncustodial sentence accomplishes the other goals of sentencing ......... 9

III. OTHER OBJECTIONS AND CLARIFICATIONS ................................................ 10

    A.    The Court should not impose a fine as requested by the government. ....... 10

    B.    The Court should suspend the mandatory drug testing conditions in this case because Mr. Lavergne does not have a history of substance abuse. ............................................................................................................ 11

    C.    The employment restriction should be limited to positions of ownership and/or management. .................................................................. 12

    D.    Other clarifications to the PSR and Recommendation letter ..................... 13

IV. CONCLUSION ......................................................................................................... 13

## I. INTRODUCTION

Chantelle Lavergne[1] has shown extraordinary resilience, rising above an unstable childhood, sexual abuse, suicide attempts, financial desperation, and single motherhood. Though it all, she has consistently worked to support herself and her daughter, building businesses, creating opportunities, and caring for her daughter with unwavering dedication. Now at, 54 years old, she faces perhaps the most terrifying prospect yet: federal prison which will almost certainly cause her to lose her home and inflict a trauma on her young adult daughter. She comes before the Court after accepting responsibility for submitting false immigration documents (mainly certifying that a physical health examination of a person seeking immigration benefits had been complete when it was not) and possession with intent to distribute phendimetrazine (a weight-loss drug she ordered from legitimate drug distributors with the DEA registration of a deceased doctor) -- conduct that arose while she while under immense personal and professional pressure.

While she owns her mistakes and serious lapses in judgment, Ms. Lavergne did not manage this business with the intent of engaging in a fraud scheme or to target or victimize any individual. The Probation Office has calculated an advisory guidelines range of 33-41 months, recommending the low-end. Though correct, that range fails to capture (1) Ms. Lavergne's history and characteristics, including her unique resilience that will ensure that she succeeds on supervised release and pays back every cent in restitution, and (2) essential context for the offense conduct which shows that this secretary turned clinic-owner temporarily lost her way but in no way meant to cause harm.

The defense respectfully asks the Court to exercise its discretion and impose a noncustodial/time-served sentence followed by a significant period of home

---

[1] This sentencing position paper will refer to Ms. Lavergne by her current legal name--Chantelle Lavergne--as opposed to her name as charged in the Information--Chantelle Lavergne Woods.

1

confinement, which is sufficient but no greater than necessary to accomplish the goals of sentencing in this particular case.

## II. SENTENCING CONSIDERATIONS

**A.  History and Characteristics of the Defendant: Ms. Lavergne's life arc shows that she is a hardworking and well-intentioned individual who is motivated to find the stability she lacked as a child, but who got temporarily lost along the way.**

### 1.  Ms. Lavergne's unstable childhood

Ms. Lavergne's life has been shaped from the beginning by instability and conflict. Her parents, Medwyn Lavergne and Evelyn Ishlove, met in Italy while Medwyn was working offshore. Evelyn, originally from South Africa, had left her home to escape her own parents' abuse. When she became pregnant, the couple married quickly in keeping with Medwyn's traditional Catholic values. After the birth of their first child in London, the family moved to Medwyn's small hometown of Winnie, Texas, where he ran a horse-breeding ranch. There, they had two more children—Ms. Lavergne and her younger brother, Selwyn.

By the time Ms. Lavergne was six years old, her parents' marriage had deteriorated to the point of no return. Her mother abruptly decided to leave Texas and took Ms. Lavergne and her sister to Port Elizabeth, South Africa—without Medwyn's consent. Ms. Lavergne believes her mother did not take her brother because she feared Medwyn's reaction if she took away his only son. Legal battles followed, resulting in an unusual and deeply disruptive custodial arrangement: the children would spend one year with their mother in South Africa, then one year with their father in Texas, alternating year by year.

This back-and-forth lasted for most of Ms. Lavergne's childhood, until she was about fourteen. She describes this time as one of constant emotional whiplash—each year filled with excitement to see one parent and heartbreak to leave the other. The instability left her feeling unmoored, without a true sense of home or belonging.

When Ms. Lavergne was seven, her father remarried. Her stepmother, Kathy, had four children of her own, and Medwyn, in his traditional way, deferred to Kathy in all matters of parenting. Ms. Lavergne recalls Kathy as cold and critical, favoring her biological children and often isolating Ms. Lavergne from the rest of the household. She was made to feel like an outsider in her own home, rarely comforted, and often disciplined for expressing ordinary childhood emotions. Kathy has since apologized to Ms. Lavergne, but the scars remain.

At just eight years old, Ms. Lavergne endured an unspeakable trauma. While living in South Africa, she was sexually abused by her maternal grandfather over the course of two weeks. The abuse came to light only when a housekeeper noticed that Ms. Lavergne would remain in the car with her grandfather longer than the other two children. Evelyn immediately severed contact with the grandfather, but the trauma was not so easily erased. That experience left lasting emotional wounds that went largely untreated and which Ms. Lavergne's brother points to as the impetus for many of Ms. Lavergne's other problems.

When Ms. Lavergne was fourteen, the international custodial arrangement ended. The children were given the impossible task of choosing which parent to live with permanently. They chose to live with their father in Texas. Although Kathy was unpleasant, Texas offered stability and certainty. By contrast, their living situations in South African were constantly in flux; Evelyn often lived in communal living situations where the children lived side by side with strangers and Evelyn's new boyfriends.

Living under the same roof as Kathy proved to be untenable for Ms. Lavergne. Ms. Lavergne had no contact with her mother at this time and she did not receive any motherly love or guidance from Kathy. Two years later, at just sixteen, Ms. Lavergne reached a breaking point. Feeling invisible and unwanted in her father's home, she attempted suicide by consuming an entire bottle of Tylenol. She was hospitalized and her life was saved after her stomach was pumped—but instead of receiving empathy or support, she was met with anger. Her stepmother accused her of seeking attention, and

3

her father, as always, deferred. From that point forward, Ms. Lavergne was isolated even more, confined to her room except for meals and chores. In some ways, Kathy was correct. Ms. Lavergne was seeking attention; she wanted to feel loved and needed help to manage her feelings.

Despite everything, Ms. Lavergne remained determined to reclaim her independence. She focused on school, worked hard, and graduated high school early so that she could leave home as soon as possible. Her early life was defined by chaos and trauma—but she survived it, and she carried that resilience into adulthood.

### 2. Independent but not free

Feeling unhappy and unsupported at home, Ms. Lavergne made the decision to graduate high school early and pursue college, dreaming of a career as a dental hygienist. With her father's quiet help, she enrolled at Lamar University in Beaumont, Texas, and threw herself into her studies, determined to create a better future. For over a year, she worked hard, balancing her coursework with the challenges of daily life.

But when her stepmother discovered the secret financial support that her father had been providing, she was cut off. Unable to afford tuition and basic living expenses, Ms. Lavergne had no choice but to leave school. Her car was repossessed, and she worried about affording rent. Desperate, she took a job at a topless bar to make ends meet—a decision she never imagined becoming long-term.

Ms. Lavergne hoped to return to school once she saved up enough money. The money was quick and easy, and it became harder to leave the industry. Slowly, her dream of finishing college faded. She fell deeper into the world of catering to men and fell into the escort business. Although she was financially secure, she didn't feel good about herself, and it wasn't the life that she had dreamt of. Many days she felt stuck, and it seemed like she could never leave. But eventually, she was able to pull herself out of it.

### 3. The happiest time of her life

Around 1996, Ms. Lavergne made a conscious decision to leave behind a life that required her to cater to others. She moved to San Diego and opened Cappie's Coffee Shop, named after her beloved dog. She describes this time as the happiest time of her life. The business provided just enough to cover her expenses, but more than financial success, it gave her a sense of pride and independence. For the first time, she was self-employed and self-made, responsible for every aspect of running a business—hiring and managing 13 employees, obtaining permits, ensuring ADA compliance, and navigating the daily challenges of entrepreneurship.

Many doubted her, warning that her coffee shop was too close to Starbucks, yet she persevered and succeeded. She had hundreds of loyal customers. She felt good about offering a service in her community. She felt free. Every day after work, she surfed and searched for God in the waves. She also picked up snowboarding and joined the U.S. Board Cross team, which gave her a healthy sense of competition and team environment.

### 4. Seeking the stable family she never had

Ms. Lavergne always dreamed of having a big family of her own. In 1999, while surfing, Ms. Lavergne met Mike Brown and fell in love. At first, their relationship was long distance, as Mike lived in Truckee, California, and did not share Ms. Lavergne's love for San Diego or her coffee shop. To take their relationship to the next level, Ms. Lavergne sold her beloved coffee shop in 2002 and used the proceeds to purchase a home in Truckee closer to Mike. In 2003, they married.

Together, Ms. Lavergne and Mike launched Sierra Turf, an aeration company, largely financed and run by Ms. Lavergne. Mike contributed little to their business or relationship. He mostly sat on the couch smoking marijuana and even left for eight months to be with another woman. Nonetheless, Ms. Lavergne forgave him and continued to shoulder the responsibilities of their life together.

Ms. Lavergne always wanted to be a mother and made those wishes clear to Mike from the very beginning. When she wanted to start a family, Mike refused. This was one dream that Ms. Lavergne could not defer; she stood firm and threatened a divorce. Mike relented and Ms. Lavergne became pregnant in 2005. During her hospitalization for the birth of their child, Mike informed Ms. Lavergne that he wanted a divorce, unwilling to embrace fatherhood.

After the birth of their daughter, Ms. Lavergne tried to make it work with Mike, but it became clear that they had irreconcilable differences. Ms. Lavergne assumed full custody without objection from Mike. In the beginning, Mike did not provide a dime and Ms. Lavergne hustled as a single mom. She later secured child support, which Mike reluctantly but faithfully provided until their daughter turned 18. Her daughter is now pursuing her education in Oregon, a testament to Ms. Lavergne's determination to create stability and opportunity for her daughter.

### 5. Seeking stability wherever she could find it

The divorce was contentious. Mike fought her on every little thing, except for custody. He told her that she would never make it on her own and she would have to crawl back to Texas and live with her dad. Self-sufficiency was a huge point of pride for Ms. Lavergne, and she was determined to succeed as a single mother. After liquidating their turf business and selling off all the equipment, she worked tirelessly to rebuild her life, ultimately buying her own home in Nipomo, where she lives today.

In 2012, Ms. Lavergne was looking for a new job and her neighbor mentioned that he knew someone who was looking for a secretary. Though she was told that she would be working for a difficult, demanding, and unkind person—who could not keep a secretary due to persistent sexual harassment—she jumped at the job so that she could support herself and her daughter. It paid $4,000 per month, which was a lot of money to her.

Ms. Lavergne began working with Dr. Sugarman, a J.D./M.D., at his medical and legal practice, where he did medical malpractice cases, as well as civil surgeon work

for immigration applications and weight loss management. Dr. Sugarman lived up to his bad reputation: he was incredibly intelligent but rude and demanding, and Ms. Lavergne experienced frequent sexual harassment. Ms. Lavergne had no medical or legal training, yet Dr. Sugarman barked orders at her without giving any training or direction. She would often bring what he asked for and he would throw it back in her face. But because of everything she had been through and all the men she had encountered, she knew she could survive it. And she had to for the sake of financial security and stability for her daughter. Eventually, she got used to the abuse. This is how she became involved in the clinic at the center of the instant offense conduct.

### 6. Almost losing it all

In 2020, during the pandemic, Ms. Lavergne sought to provide a safe home for her aging mother, building a tiny house on her property. She hired Charles Woods to construct it, and they began a relationship, eventually marrying in 2021. Unbeknownst to Ms. Lavergne, Charles was unfaithful from the start of their relationship—a devastating discovery given her history. Charles had children from a prior relationship and their union gave Ms. Lavergne the big family she always dreamed of. She excitedly took on the role of stepmother, hoping to be the complete opposite of what she had experienced.

In July 2022, the DEA raided Ms. Lavergne's home and office. It was the shock of a lifetime that threatened to upset all of the stability that she had worked for. While her marriage and business ended that day, Ms. Lavergne did not let it completely derail her hope and plans for the future. Above all, she knows that she is a survivor. She is determined to comeback stronger and she will work incredibly hard to make amends, pay back restitution, find employment, and learn from these mistakes.

**B.   Nature and circumstances of the offense: While running a legitimate business, Ms. Lavergne made mistakes under immense pressure at home and at work.**

This is not one of those fraud schemes where the defendant set out to target or exploit certain individuals or was soliciting investments in a phantom business with the hopes of pocketing that money and never paying the investors back. To the contrary, Ms. Lavergne was running a real business. She was trained by a real doctor and lawyer. Although she had good intentions, she accepts that she made this mistake, and that she must pay the price for it. But in the spectrum of frauds, and the range of bad intents that a schemer could possess, Ms. Lavergne is far from the worst end of that spectrum. She made a very human mistake under intense pressure, and the context surrounding her mistake supports a downward variance in her sentence.

As Ms. Lavergne explains in detail in her letter, she began working in the clinic under difficult circumstances. Dr. Sugarman, the owner and her boss, was demanding and demeaning. She was often left to her own to figure it out and asking for guidance was really out of the question. It is in this environment that Ms. Lavergne learned the ropes of the clinic. She learned to survive, not thrive, under Dr. Sugarman. She believed him to an impressive and successful man, he was a doctor and a lawyer after all. And she could not afford to lose this job. With this personal and professional pressure all stacked on her, she began to lose herself. She did not question when she should have. She lost boundaries that she had set for herself a long time ago. She fell back into the catering mindset and just wanted to be valuable and un-fireable.

When Dr. Sugarman passed away, Ms. Lavergne took over the clinic. While she had some experience running a business, she was still not properly trained in medical or legal matters. When Dr. Smith and then Dr. Greer took over as the acting doctors on duty, they strangely relied on Ms. Lavergne far too much despite having their own medical training and duties as doctors. Ms. Lavergne fully acknowledges that:

> At the time, I was acting out of fear, habit, and survival — following the same patterns I had learned over nearly ten years

> under both doctors. I wanted to do right by the patients and keep the business stable, never realizing that my actions carried serious legal implications. Looking back now, I understand that I should have stopped all operations immediately and sought proper medical and legal guidance. I take full responsibility for not knowing better at the time, My intentions were never to deceive or do wrong, but to hold things together in a time of chaos, grief, and loss.

See Ex. A (Letter from Ms. Lavergne).

Despite these mistakes and serious lapse in judgment, Ms. Lavergne is not beyond hope or the possibility of redemption. She took what was perhaps the hardest and most humbling step towards that redemption the day she took responsibility and pled guilty to all counts in this case. She has grown, even if painfully so, throughout this process, which has initiated difficult but necessary reflection about her life and what brought her to this point in her life. But this is only the beginning of her journey. Since prioritizing her mental health through spiritual programming, meditation, exercise, and family time, she is gaining confidence again, finding peace with her trauma, and is extremely motivated to make amends however the Court sees fit.

**C.     A noncustodial sentence accomplishes the other goals of sentencing.**

Ms. Lavergne recognizes that a meaningful sentence that adequately punishes her for her conduct is warranted. But that sanction should also reflect the reality that a custodial sentence does not serve the purposes of the Sentencing Reform Act in this case. The sentence that Ms. Lavergne proposes -- a time-served sentence with a significant term of supervision to include home detention -- is a sentence that sanctions Ms. Lavergne for her conduct but allows her to keep her home and find work to support herself and her daughter and pay her restitution obligation.

A significant period of home confinement is also meaningful. Both the Sentencing Guidelines and the Bureau of Prisons contemplate using home confinement in place of imprisonment. *See* 28 C.F.R. § 570.20(b) et seq. (vesting the Bureau of Prisons with authority to designate inmates to home confinement); U.S.S.G. § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."); *see also United States v. Lopez-Pastrana*,

9

889 F.3d 13, 18-19 (1st Cir. 2018) ("Home confinement is treated as a form of 'custody' under federal law…."). It will limit her to a specific range of strictly necessary activities, which would primarily be medical appointments and working so that she can immediately begin to contribute to his restitution obligation. The constant need to receive permission to travel anywhere from her location monitoring officer will serve as an additional, routine reminder that Ms. Lavergne is being sanctioned for her conduct. She will not be able to visit her child in Oregon, which is a particularly meaningful reminder of the consequences of her conduct. A significant period of supervision will moreover afford the Court a robust source of authority to punish Ms. Lavergne should she in any way vary from the terms of supervision.

### III.  OTHER OBJECTIONS AND CLARIFICATIONS

**A.   The Court should not impose a fine as requested by the government.**

The Probation Office, which has received and reviewed Ms. Lavergne's most recent financial information, found that Ms. Lavergne is unable to pay a fine and is not likely to become able to pay a fine. *See* PSR ¶¶ 133-139; Recommendation Letter at 1. The government, however, requests a $84,150 fine but points to no financial information that would support Ms. Lavergne's ability to pay such a fine. (ECF No. 47 at 3, 6-7) Instead, the government appears to be asking the Court to impose a fine to cover the difference between the restitution agreed to in the plea agreement and the restitution the government is properly able to seek. *Id*.

U.S.S.G. § 5E1.2 requires the sentencing court to "impose a fine in all cases, except where the defendant establishes that [s]he *is unable* to pay and *is not likely to become able* to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added). If the defendant establishes both of these facts, or if the district court determines that "imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine." U.S.S.G. § 5E1.2(f).

It is clear from the PSR that Ms. Lavergne lives paycheck to paycheck. See PSR ¶¶ 133-134; *United States v. Robinson,* 20 F.3d 1030, 1033 (9th Cir. 1994) ("We have

previously noted that the facts contained in a presentence report are an important factor in determining inability to pay."). She has less than $200 in savings. *See id*. Her biggest asset is her home, which she purchased in 2007, long before becoming involved in the instant offense, and for which she still owes approximately $580,000 on the mortgage. *See id*. Due to this case, she has had trouble finding employment. As a result, most of her income comes from renting out spaces on her property to people with RVs. But that is not enough to break even; many months, she only gets by through gifts from family and her ex-husband. After not being able to find traditional employment, she recently started landscaping for a neighbor, earning $20/hour, and doing receptionist work for a friend, earning $20/hour. Based on this financial information, there is no reason to believe that Ms. Lavergne's earning potential or financial circumstances will change in the future to be able to pay a significant fine.

   To be clear, Ms. Lavergne has no objection to the imposition of $63,450 in restitution, which is $450 multiplied by 141 patients. However, the idea that she received a large windfall is not accurate. Of the $450 that the clinic charged each patient for the immigration examination, $150 went to the lab that performed valid blood tests, $100 went to the doctor on duty, and the remaining $200 went back to the clinic for operating expenses. While Ms. Lavergne stands by her plea and her acceptance of responsibility, this was hardly a money-making machine that earned her some great windfall. If the Court disagrees with this ability to pay analysis and is inclined to remedy the perceived windfall with a fine, the fine should be limited to $200 per person.

**B.** **The Court should suspend the mandatory drug testing conditions in this case because Mr. Lavergne does not have a history of substance abuse.**

   As a condition of supervised release, the Probation Office recommends drug testing because "Woods possessed with intent to distribute controlled substances." See Recommendation Letter at 2, 6. Though true, the controlled substance that was

distributed was phendimentrazine, a Schedule III weight-loss drug, which is not known for addictive qualities. Moreover, Ms. Lavergne was not taking the drug herself, and importantly, Ms. Lavergne has no history of drug abuse. While she honestly reported to trying marijuana, ecstasy, and cocaine in her early 20s, *see* PSR ¶ 114-116, she never tried those substances more than twice and has not used in over 30 years. Ms. Lavergne is very conscientious about what she puts in her body; she rarely takes medication and stopped drinking alcohol over 10 years ago. PSR at ¶ 116. While Ms. Lavergne is confident that she would pass every drug test given to her, undersigned counsel is concerned about the burden that testing will present. Ms. Lavergne lives in Nipomo, California and getting to a drug testing facility would likely be a very long commute. Given her lack of drug abuse history, she presents a very low risk of future substance abuse. Because of the low risk and the likelihood that the condition will be very burdensome, the Court should suspend the condition in this case. *See* 18 U.S.C. § 3563(a)(5).

### C. The employment restriction should be limited to positions of ownership and/or management.

The Probation Officer recommends an employment restriction that prohibits Ms. Lavergne from being an owner or employee in any immigration or medical business. *See* Recommendation Letter at 2 (Proposed Condition 6). Ms. Lavergne does not object to the restriction on being an owner, but does object to the restriction on being an employee. After struggling to find employment, Ms. Lavergne was recently hired by a friend to be a receptionist at a podiatrist office. As a receptionist, she mainly answers phones, greets patients, and handles other simple office tasks, like faxing paperwork. In performing reception and secretarial work, Ms. Lavergne has no decision-making power over the business and therefore she poses no risk to the public. The Probation Office must still approve her employment generally and will be aware of her employment, which is a sufficient deterrent in this case.

**D.    Other clarifications to the PSR and Recommendation letter**

- The PSR refers to Ms. Lavergne as "Chantelle Lavergne Woods" throughout. This was her legal name at the time of the investigation and charges. Ms. Lavergne has since changed her name legally from Chantelle Lavergne Woods to Chantelle Christine Lavergne as a result of her divorce.

- The recommendation letter mistakenly states that Ms. Lavergne's probation was revoked. *See* Recommendation Letter at 5. The PSR has since been revised to correct this information and the defense asks that the recommendation letter be revised, as well. *See* PSR at ¶58.

## IV. CONCLUSION

For these reasons, Ms. Lavergne respectfully requests a non-custodial sentence.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: November 3, 2025        By  */s/ Elena Sadowsky*
ELENA SADOWSKY
Deputy Federal Public Defender
Attorney for Chantelle Lavergne Woods

13